961 F.2d 1565
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Wanda PANTOJAS, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 91-2147.
 United States Court of Appeals,
First Circuit.
 May 19, 1992
 
 Salvador Medina De La Cruz on brief for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and Joseph E. Dunn, Assistant Regional Attorney, Office of the General Counsel, Dept. of Health & Human Services, on brief for appellee.
 Before Breyer, Chief Judge, Selya and Cyr, Circuit Judges.
 Per Curiam.
 
 
 1
 The Secretary determined that despite a variety of ailments, claimant could perform her past work as a group leader in the pharmaceutical industry and denied disability benefits. Claiming, among other things, that the ALJ impermissibly interpreted raw medical data to reach his own assessment of functional capacity and improperly discounted complaints of pain, claimant seeks review. For reasons which follow, we conclude a remand is required.
 
 I.
 
 2
 Claimant, born in 1952 and high-school educated, worked for many years as an assistant supervisor or group leader packaging medicines. In March 1987, she injured herself at work lifting a box, and she has not worked since.
 
 
 3
 According to the medical evidence, claimant was hospitalized for four days with acute pain in the cervical region. Upon discharge, she was treated periodically at the State Insurance Fund. The notes are illegible in places, but they do reveal that claimant consistently complained of pain, that objective indicia (e.g., spasm) of painful conditions were noted, and that pain medications (parafon forte, norflex), muscle relaxants (flexeril), and anti-inflammatory drugs (clinoril, motrin, nalfon, feldene, ponstel, neprosyn) were prescribed. For example, at an early visit in March 1987, claimant complained of pain in the cervical and paravertebral muscles. Spasm was noted. The diagnosis was cervical myositis, possible cervical sprain, and right shoulder strain. An x-ray of the cervical spine showed "slight narrowing of the C5-C6 disc space suggest[ing] HNP [herniated nuclear pulpus]" and "straightened lordosis indicative of muscle spasm." Two months after the injury, cervicodorsal pain and pain in both shoulders continued. Pain medications were refilled, claimant was recommended to remain resting, and claimant was referred for physiotherapy. In July, continued complaints of neck pain, marked limitation of movement, marked spasm at both trapezii, and mild to moderate spasm of paravertebral and cervical muscles were noted. In August, after claimant contended that the physical therapy was causing much pain and that her neck had swelled, the physiatrist suspended physical therapy and recommended reevaluation. The next month spasm was again noted along with complaints of stiffness and swelling of the hands. An EMG was recommended. At her October visit (seven months after the accident), lumbosacral and cervical pain were recorded as persisting and claimant's prescriptions were refilled.
 
 
 4
 In December 1987, the disability determination program sent claimant to Dr. Deniz for a neurological evaluation. Claimant reported low back pain radiating to both legs and inability to stand or walk more than 10 minutes. Dr. Deniz found evidence of muscle spasm mainly in the lumbar and cervical areas, but full range of motion in all extremities except the neck and trunk, which were limited by back pain, and no joint deformity or atrophy. Lasegue's test and Patrick's test were positive. Tinel's sign was positive at both wrists and Erbs (C6) points. There was diminished sensation at L5-S1. Dr. Deniz diagnosed "probable thoracic outlet syndrome," "possible carpal tunnel syndrome," "probable L5-S1 root lesion," "cervical and lumbar fibromyositis," and obesity. He summed up as follows:
 
 
 5
 Generally, neurological examination could be compatible with L5-S1 root lesion, Thoracic Outlet Syndrome and Rt. Carpal Tunnel Syndrome[. N]evertheless in order to elucidate her picture, we would do an EMG and NCS of four extremities.
 
 
 6
 Dr. Deniz did not complete a residual functional capacity assessment, but a nonexamining doctor was referred to Dr. Deniz's findings and checked off boxes indicating that claimant could frequently lift and carry up to 25 pounds, stand or walk six hours, sit six hours, and reach, handle, finger, or feel without limitation.
 
 
 7
 An EMG was performed on January 22, 1988. The results were compatible with carpal tunnel syndrome. Evaluation by a thoracic surgeon was recommended.
 
 
 8
 After the EMG results were received, the medical record was referred to another nonexamining doctor for assessment, who checked off the same boxes as the earlier physician.
 
 
 9
 Claimant testified at a hearing held on August 1, 1988. She claimed that her neck, shoulders, waist, and right hand were painful, that she lacked the strength to grasp anything, and that raising her arm to take an oath or moving her neck were very painful. Medication helped "very little."
 
 
 10
 After the hearing, the ALJ ordered a neurological assessment and an EMG. The neurological assessment was performed on October 25, 1988 by Dr. Perez-Nazario. His report indicates that in addition to examining claimant, he reviewed one medical report-an undated EMG and nerve conduction velocity study. No undated EMG appears in the medical record, and Dr. Perez-Nazario's report does not indicate what the EMG findings were. Dr. Perez-Nazario found claimant's complaints of hand, arm, neck, and head pain and limitation of movement to be exaggerated. For example, neck movement was limited to 15 degrees when tested, but on indirect observation, movement was normal. Initially, little effort was exerted in right hand grip, but second testing was normal, and Dr. Perez-Nazario concluded that there was no atrophy or objective muscle weakness. Some spasm of the trapezius muscle was noted, but no spasm in the back. His impression was as follows:
 
 
 11
 1. Myositis Trapezze muscle, mild.
 
 
 12
 2. No objective neurological signs of [thoracic outlet syndrome], median nerve neuropathy or carpo tunnel syndrome, at present examination.
 
 
 13
 3. Sensory, motor changes and motion limitation ... not corroborated by indirect observation.
 
 
 14
 4. Rule out Psychiatric diagnosis based in number 3.
 
 
 15
 He concluded claimant could lift up to 25 pounds, stand or sit eight hours, and reach, handle, push or pull without restriction. As explanation for these conclusions, Dr. Perez-Nazario wrote that there was "no objective clinical sign of limitation" and "no objective neurological sign."
 
 
 16
 The last piece of medical evidence comes from Dr. Deniz, who conducted an EMG study in February 1989. The findings with respect to the upper extremities were "compatible with rt. ulnar nerve compression neuropathy across Erb's point and Rt. Carpal Tunnel Syndrome."
 
 
 17
 The ALJ concluded claimant had the capacity to perform light work, including her past work as a group leader, and denied benefits.
 
 II.
 
 18
 Dr. Perez-Nazario's report and RFC support the ALJ's conclusion. Dr. Perez-Nazario considered claimant's multiple complaints, observed inconsistency between claimed limitation and actual movement, found "no objective clinical sign of limitation," and concluded, essentially, that claimant had exaggerated. The problem, however, is that Dr. Perez-Nazario viewed only one undated EMG, the results of which are not in the record, and does not appear to have been aware of either the January 1988 EMG, the findings of which were compatible with carpal tunnel syndrome, or Dr. Deniz's February 1989 EMG, which was compatible with right carpal tunnel syndrome and right ulnar nerve compression neuropathy. His ignorance of these EMG's is particularly troubling given Dr. Perez-Nazario's emphasis on the lack of "objective" evidence. Consequently, on the present record, we do not know whether Dr. Perez-Nazario would have classified these studies as "objective" evidence and revised his assessment of claimant's functional abilities and complaints of pain.
 
 
 19
 Nor did any other doctor-nonexamining or examining-review the most recent EMG and assess claimant's capabilities in its light.[1] Rather, the February 1989 EMG was the last piece of evidence received. Thereafter, the ALJ-in contrast to Dr. Perez-Nazario-concluded that claimant did have right ulnar nerve compression and right carpal tunnel syndrome, but adopted, essentially, Dr. Perez-Nazario's RFC, an RFC based on a report which seemingly had rejected those diagnoses for lack of objective evidence.
 
 
 20
 We, as lay persons, do not know the significance in functional, work related ability terms of EMG findings compatible with CTS and ulnar nerve compression neuropathy.
 
 
 21
 What does emerge from the record, however, is that EMG test results apparently are important to neurologists, for as early as September 1987, a treating physician at the SIF recommended one be done, a recommendation repeated several months later by the Secretary's consultant, Dr. Deniz. Furthermore, claimant specifically asked that the EMG precede the neurological evaluation so that the Secretary's examining doctor would have the EMG findings when assessing RFC, but this was not done. In these circumstances, we do not think it is proper for an ALJ, a lay factfinder, to adopt, without explanation, the RFC of a doctor who did not have the benefit as to EMG findings. Needed is an explanation from a doctor as to the significance of the February 1989 EMG findings with respect to claimant's residual functional capacity.
 
 
 22
 The judgment of the district court is vacated and the case is remanded with directions to remand to the Secretary for further proceedings consistent with this opinion.
 
 
 23
 Dissent follows.
 
 
 24
 Selya, Circuit Judge (dissenting).
 
 
 25
 I find the opinion of the court below, Pantojas v. Secretary of HHS, Civ. No. 89-1688-GG (D.P.R. Aug. 12, 1991), more persuasive than that of our court. And, I would affirm the judgment on that basis. Hence, I respectfully dissent.
 
 
 
 [1]
 To be sure, the nonexamining doctor who filled out an RFC form in April 1988 did have the benefit of the January 1988 EMG, yet concluded that claimant could frequently lift up to 25 pounds and had unlimited handling and fingering ability. The 1988 EMG, however, differed from the 1989 one. Whereas the findings of the first one were compatible with carpal tunnel syndrome, a syndrome involving compression of the median nerve, the 1989 findings were compatible with both CTS and ulnar nerve compression neuropathy, suggesting that more nerves had become involved